**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

MiMedx Group Incorporated,

Plaintiff,

v.

Surgenex LLC,

Defendant.

No. CV-24-03558-PHX-SMB

**ORDER**

Pending before the Court are Plaintiff MiMedx Group Inc.'s and Defendant Surgenex LLC's opening claim construction briefs, responses, and joint statement. (Docs. 78, 82, 102, 107, 119.) On December 8, 2025, the Court conducted a Markman Hearing (the "Hearing") in this matter pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Consistent with the *Markman* requirements, the Court construes the disputed claims in the following eight patents: U.S. Patent No. 8,709,494 ("the '494 Patent"); U.S. Patent No. 9,956,253 ("the '253 Patent"); U.S. Patent No. 10,406,259 ("the '259 Patent"); U.S. Patent No. 9,572,839 ("the '839 Patent"); U.S. Patent No. 11,752,174 ("the '174 Patent"); U.S. Patent No. 8,323,701 ("the '701 Patent"); U.S. Patent No. 9,789,137 ("the '137 Patent"); and U.S. Patent No. 10,874,697 ("the '697 Patent") (collectively, the "Asserted Patents").

## I.    BACKGROUND

MiMedx is a corporation that develops, manufactures, and markets wound intervention products made from human placental amniotic membranes. Surgenex is a

contract research and manufacturing organization specializing in human cellular and tissue-based products. The Asserted Patents are part of MiMedx's patent portfolio and relate to the preparation and clinical application of tissue grafts from processed human placenta. On December 16, 2024, MiMedx sued Surgenex for alleged infringement of the Asserted Patents. (Doc. 1.) Surgenex counterclaimed, seeking declaratory judgment of non-infringement and invalidity as to the Asserted Patents. (Doc. 16.) The parties filed claim construction briefs regarding the disputed terms in the Asserted Patents.

## II.    LEGAL STANDARD

As an initial matter, district courts "are bound to follow substantive patent law as decided by the Federal Circuit." *Wang Lab'ys, Inc. v. Oki Elec. Indus. Co.*, 15 F. Supp. 2d 166, 175 (D. Mass. 1998). Thus, this Court is controlled by Federal Circuit authority in construing the Asserted Patents.

### A. Claim Construction

Claim construction is "a matter of law reserved entirely for the court." *Markman*, 517 U.S. at 372. "In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). These sources, known as "intrinsic evidence," include the patent itself, the claims, the specification, and the prosecution history if in evidence. *Id.* In construing claim terms, the Federal Circuit has outlined a helpful three-step analysis. *See id.* at 1582–83.

First, courts look "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Id.* at 1582. Generally, terms "are given their ordinary and customary meaning as understood by one of skill in the art at the time of the invention." *Vehicle IP, LLC v. AT&T Mobility, LLC*, 594 F. App'x 636, 641 (Fed. Cir. 2014). Courts will only deviate from a term's ordinary meaning in two instances: "(1) when a patentee sets out a definition and acts as his own lexicographer; or (2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Id.* Importantly, the ordinary meaning of a term is not defined in

a "vacuum," but rather understood "in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (citation modified); *see also Smartrend Mfg. Grp., Inc. v. Opti-Luxx Inc.*, 159 F.4th 1322, 1328(Fed. Cir. 2025).

Second, courts review the specification.  The specification "contains a written description of the invention" and may act "as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics*, 90 F.3d at 1582. Therefore, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

Third, the court reviews the prosecution history.  A patent's prosecution history, also known as the file history, "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims.  As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." *Vitrionics*, 90 F.3d at 1582.  This record may show "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

In most situations, the above analysis "alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583.

## B. Indefiniteness

"Definiteness is a statutory requirement for patentability." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346 (Fed. Cir. 2022) (discussing 35 U.S.C. § 112). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

Determining definiteness is a "delicate balance" that weighs the "modicum of uncertainty" necessary to incentivize innovation against the demand to clearly apprise the public "of what is still open to them." *Nautilus*, 572 U.S. at 909 (quoting *Markman*, 517 U.S. at 373). Thus, "[t]he definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.* at 910.

**III.    DISCUSSION**

The parties request construction of six disputed terms, or grouping of terms, across the eight patents at issue. The Court addresses each below.

**A. Claim Terms: "washed" grouping**

The parties stipulated to the Court grouping the following terms: "washed and/or substantially cleaned" ('494 Patent: Claim 1); "washed and substantially cleaned" ('253 Patent: Claim 5; '137 Patent: Claim 6); "washed, cleaned" ('253 Patent: Claim 1); and "washed" ('494 Patent: Claims 9, 10; '253 Patent: Claim 7; '259 Patent: Claims 1, 6; '137 Patent: Claims 1, 2) (collectively, the "Wash Group Patents"). (Doc. 119 at 3 n.1.)

| MiMedx's Proposed Construction | Surgenex's Proposed Construction | The Court's Construction |
|---|---|---|
| "wherein substantially all of the extraneous material (e.g., blood clots and spongy/connective tissue) has been removed" | Plain and ordinary meaning. These claim terms do not require removal of the intermediate or spongy layer.<br><br>MiMedx's proposed construction would render the terms indefinite. | Wherein substantially all of the extraneous material (e.g., blood clots and spongy/connective tissue) has been removed. |

The Court will first construe the disputed terms, then determine whether the construction is indefinite.

*1. Claim Construction*

a.  Ordinary meaning

The Court begins by looking to the claim terms themselves. Patents '494, '253, '259, and '137 respectively inform a person of ordinary skill in the art ("POSITA") to "wash" or "clean" the amnion and chorion layers of a placenta, or reference a "washed" or

"cleaned" amnion or chorion layer. The claims do not expound further on this washing/cleaning. Admittedly, the ordinary meaning of these terms is unhelpful. Customarily, such terms mean to remove. *See Wash*, Merriam-Webster, https://www.merriam-webster.com/dictionary/wash (last visited January 5, 2026) ("To remove (something, such as dirt) by rubbing or drenching with liquid"); *Clean*, Merriam-Webster, https://www.merriam-webster.com/dictionary/clean (last visited January 5, 2026) ("remove, eradicate"). The parties do not appear to dispute this ordinary meaning. However, the parties contest what *is* being removed.

Therefore, construction, here, has more to do with the context in which the terms are being used rather than the customary meaning of the terms. *See Phillips*, 415 F.3d at 1321 (cautioning courts to avoid focusing "on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent"). Accordingly, the Court must look to the specification and prosecution history (*i.e.*, the file history) to determine the object of removal.

### b. Specification

The placenta consists of an amnion and a chorion membrane. The Wash Group Patents describe the amnion membrane as containing four sublayers: (1) epithelium cell layer; (2) basement membrane; (3) compact layer; and (4) fibroblast layer. The parties provide the following depictions of these layers.



(Doc. 82 at 4.)



(Doc. 78 at 11.)

The Wash Group Patents then describe separating the amnion and the chorion layers. The parties agree that this separation occurs at the intermediate or spongy tissue layer of the placenta. (Doc. 129 at 48 ("I think the parties agree, everybody agrees, all the experts agree, that when you go to split the amnion and the chorion, you're going to split it at that spongy layer. That's where it naturally pulls apart.").) After this separation, the Patents direct a person to clean the amnion or chorion membranes. Therein lies the dispute: does this cleaning include the removal of the spongy tissue?

Patents '494, '253, and '259 provide an identical explanation of how the amnion and chorion membranes are cleaned. These Patents state:

> Care is then taken to remove blood clots and other *extraneous tissue* from each layer of tissue until the amniotic membrane tissue and the chorion are clean and ready for further processing. More specifically, the amnion and chorion tissues are placed on the processing tray and blood clots are carefully removed using a blunt instrument, a finger, or a sterile non-particulating gauze, by gently rubbing the blood until it is free from the stromal tissue of the amnion and from the trophoblast tissue of the chorion.

(Doc. 1-1 at 12, 29, 45 (emphasis added).)[1] The parties disagree as to whether "extraneous

---

[1] The Court notes that the '137 Patent does not contain a reference to "extraneous tissue." (Doc. 1-1 at 123–141.) Without this reference, the Court finds it difficult to conclude that a POSITA would interpret the '137 Patent's reference to washing and cleaning to mean removal of the spongy tissue. However, Federal Circuit precedent potentially supports using the specification of one patent "as intrinsic evidence in construing claims" in a related

tissue" includes the spongy tissue.[2]

MiMedx argues in the affirmative. It explains that the spongy tissue is extraneous to the amnion because Patents '494, '253, '259, and '137 define the scope of the amniotic membrane as consisting of four sublayers—excluding the spongy tissue. (Doc. 82 at 9–10.) It argues that this exclusion would be noticeable to a POSITA because "contemporaneous publications" described the amnion as having a fifth sublayer that included the spongy tissue. (*Id.*) Therefore, a POSITA at the time would understand the specification's directive to remove "other extraneous tissue" to include the removal of the spongy tissue—i.e., tissue outside the defined scope of the amnion. (*Id.* at 10.)

Surgenex disagrees, but in doing so, provides contradictory arguments. It argues that a POSITA would not understand spongy tissue to be "extraneous tissue" because it is "a component of the natural placental membrane." (Doc. 78 at 17–18.) But Surgenex also argues that a POSITA would understand "extraneous tissue" to mean "remnants of tissue from various other pathological states, and dead tissue." (*Id.* at 17.) So, on one hand, Surgenex argues that "extraneous tissue" excludes spongy tissue because it is native to the placenta, but on the other hand argues a POSITA would understand "extraneous tissue" to include diseased or dead placental tissue. Accordingly, the Court finds Surgenex's argument unpersuasive. The Court agrees with MiMedx that "extraneous tissue" "refers to material that is not amnion or chorion"—rather than material that is separate from the placenta as a whole—because the specifications consistently use "extraneous" in reference to the amnion and chorion specifically. (Doc. 107 at 6.)

Surgenex, however, brings up a fair point: MiMedx's argument, if accepted, only gets it halfway. (Doc. 102 at 13; Doc. 129 at 65.) According to MiMedx, a POSITA would understand the spongy tissue to be extraneous to the amnion because the specification defines the scope of the amnion sub-layers to the exclusion of such tissue. But what about

---

patent. *See E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1069 (Fed. Cir. 2019). Nevertheless, the parties do not discuss this possible point of friction and jointly stipulated to interpreting the "wash" and "clean" terms across Patents '494, '253, '259, and '137 as a group. (Doc. 119 at 3 n.1.)

[2] The parties agree that "spongy tissue" is not stated in any of the Asserted Patents.

- 7 -

when washing the chorion?  The specifications do not delineate the chorion's sub-layers. So how is a POSITA to know that the spongy tissue is extraneous to the chorion and should be removed when washing?

In the *Markman* hearing, MiMedx responded: "No person of skill in the art at the time, and there is certainly no evidence of that, would have thought the spongy layer is part of the chorion.  Surgenex didn't show anything on that point." (Doc. 129 at 85–86.)  So MiMedx's argument goes that the specification's narrow definition of the amnion sub-layers is necessary because a POSITA could have understood the spongy layer to be a fifth sub-layer of the amnion, as described in contemporaneous publications.  (Doc. 82 at 9–10.) But the same notice is apparently not required when washing the chorion because no POSITA would have considered the spongy tissue to be included.  (Doc. 129 at 85–86.) MiMedx's expert, Dr. Stephen Badylak, agrees: "One of skill in the art would not understand the spongy layer to be part of the chorion." (Doc. 82-6 Ex. 5 at 16.)  However, Surgenex's expert, Dr. Rouzbeh R. Taghizadeh, responds that Dr. Badylak's statement is "conclusory and unsupported," noting that "Dr. Badylak does not address this issue at all." (Doc. 102-2 at 10.)  Surgenex's expert is right.  Dr. Badylak's declaration does not address this issue outside of this statement and does not cite any evidence to support this conclusion.  Therefore, the Court will discount Dr. Badylak's statement.  *See Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").  Accordingly, MiMedx fails to meaningfully address this gap in their theory.

Surgenex next argues that MiMedx fails to invoke the lexicography exception and therefore cannot redefine "washed" and "cleaned" to include the removal of the spongy tissue.  (Doc. 78 at 18; Doc. 102 at 12–14.)  Surgenex is incorrect.  This exception is not relevant here.  When construing claims, courts generally give disputed terms their "ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  However, there is an

- 8 -

exception. A court may deviate from the plain and ordinary meaning of a disputed term if the patentee acted as his own "lexicographer," meaning he clearly sets forth his own definition of the disputed claim term. *See id.* Surgenex argues the reference to "extraneous tissue" does not clearly redefine the terms "washed" and "cleaned" to include the removal of spongy tissue, so the Court must apply the plain and ordinary meaning of the terms. (Doc. 78 at 18.) Surgenex's error begins with its premise: MiMedx is not redefining the terms "washed" and "cleaned."

Surgenex states, "[n]othing about the words 'washing' or 'cleaning' connotes removing substantially all of a layer of tissue."[3] (Doc. 78 at 17.) In isolation, this is true. "Wash" and "clean" are transitive verbs that mean to remove. The amnion and chorion are the direct objects of this action. Thus, the plain and ordinary meaning of "wash" and "clean" is to remove *something* from the amnion and chorion. Importantly, the terms "wash" and "clean"—by themselves—do not define what that something is; the terms only convey a general action. Therefore, context is necessary to fill this gap. *See Phillips*, 415 F.3d at 1321.

Turning to context does not redefine the original call to "wash" and "clean." For example, identifying what you wash off your shoes does not alter the meaning of "wash your shoes." Same too here. MiMedx's proposed construction identifying the spongy tissue layer as part of the matter washed and cleaned from the amnion and chorion does not redefine the terms "washed" and "cleaned." Therefore, the Court finds that MiMedx is not attempting to act as a lexicographer and redefine or limit the terms "wash" and "clean," but is rather asking the Court to look to context to fully define these terms. *See id.* at 1323 (explaining that there is a "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim").

---

[3] However, it is also true that these words do not connote the removal of blood clots, but Surgenex concludes that "[t]he purpose of washing and cleaning the tissues is to remove blood clots and other contaminants that are present on the placenta in the form received from a hospital or a tissue bank." (Doc. 78 at 16.) So, according to Surgenex, defining "wash" and "clean" to include spongy tissue redefines these words, but defining them to include "blood clots" does not.

Surgenex next argues that the Court cannot read removal of extraneous tissue into "wash" and "clean" because this description is only found in one embodiment of the specification, and the Asserted Patents state that the "examples and embodiments" "are intended as illustrative only" and not "intend[ed] to limit the scope of the invention." (Doc. 78 at 19; Doc. 1-1 at 11 '494 Patent at 4:24–40). This argument merely rejiggers the lexicography contention. The specification, here, is adding context to the claim language rather than limiting the claims. Again, although "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," the Court finds it steps aptly. *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

c. Prosecution History

The Court now turns to the prosecution history. MiMedx directs the Court to the following prosecution histories in support of its claim construction: (1) the '494 Patent file history; (2) the '494 Patent reexamination; and (3) the '259 Patent file history. (Doc. 82 at 10–13.) Surgenex flags the prosecution history of the '437 Patent, which is not asserted here but apparently a parent patent, and the priority applications. (Doc. 78 at 20–21.) The Court considers each intrinsic evidence in turn.

**i. The '494 Patent File History**

MiMedx begins with the patent applicant's amendment and reply asking the United States Patent and Trademark Office's ("USPTO") to reconsider his '494 Patent application. *See Eye Therapies, LLC v. Slayback Pharma, LLC*, 141 F.4th 1264, 1269 (Fed. Cir. 2025) ("An applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." (citation modified)); *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[A]n applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the invention.").

In his remarks, the patent applicant stated that "it is well known that the placental comprises three layers": "the amnion layer"; "the middle layer of the placenta is sometimes

referred to as the connective or intermediate layer"; and "the chorion layer." (Doc. 82-4 Ex. 3 at 6.) He then explained that "the tissue grafts of this invention employ amnion . . . and chorion separated from the placenta and the connective or intermediate layer." (*Id.*) He emphasizes that the amnion and chorion layers, when laminated to each other, "do[] not contain the connective layer." (*Id.*) MiMedx argues these remarks support its contention that the intermediate or spongy tissue layer is considered extraneous to the amnion and chorion and therefore washed and cleaned from an amnion and chorion graft. (Doc. 82 at 10.)

Surgenex notes an apparent contradiction. In MiMedx's opening claim construction brief to U.S. District Court for the Northern District of Georgia regarding the '494 Patent, it argued that this same statement from the patent applicant "simply has nothing to do with the concept of 'washing' and 'cleaning' the 'amnion/chorion layer(s).'" (Doc. 102-3 Ex. 52 at ep.[4] 396.) This change of tune is certainly unflattering to MiMedx's current interpretation of the statement. Nevertheless, the Court finds—irrespective of MiMedx's contradictory arguments—that the patent applicant understood the spongy tissue to be a separate layer apart from, and thus extraneous to, the amnion and chorion.

### ii.  The '494 Patent Reexamination

Next, MiMedx points to an *ex parte* reexamination of the '494 Patent. (Doc. 82-7 Ex. 6 at 3.) "An *ex parte* reexamination is a curative proceeding meant to correct or eliminate erroneously granted patents." *3rd Eye Surveillance, LLC v. United States*, 167 Fed. Cl. 719, 729 (2023) (citation modified). "Reexaminations are part of the prosecution history, and are therefore part of the intrinsic evidence." *Id.* at 729–30 (citation modified). In the '494 Patent reexamination, the USPTO concluded that prior art did not anticipate the '494 Patent's novel removal of the spongy layer. (Doc. 82-8 Ex. 7 at 4–6.) In reaching this decision, it found three expert declarations particularly persuasive.

First, citing Dr. Badylak's declaration, the USPTO found that "a person of ordinary

---

[4] "Ep." stands for electronic page. The Court references the electronic page number of the PDF here because, after downloading the Response Brief and its Exhibits from the record, the automatic page numbering headers for Exhibit overlap with previous automatic headers and are unreadable for citation purposes.

skill in the art would understand that the spongy layer is a separate layer apart from the amnion layer or the chorion layer" given the specification's narrow definition of the amniotic membrane to the exclusion of the spongy layer. (*Id.* at 4.) Then, citing Dr. Rebecca Baergen, it explained that separation of the amnion from the chorion would "disrupt the intermediate spongy layer" and leave "portions of the spongy layer" on the separated amnion and chorion layers, which were removed "by washing and/or cleaning the amnion and chorion." (*Id.* at 5.) The USPTO then cited Dr. Baergen's conclusion "that in view of the disclosure of the '494 patent specification and the prosecution history, that the 'spongy layer' is considered to be 'extraneous' to amnion and chorion layers." (*Id.* at 5–6.) Finally, the USPTO cited Dr. Andrew Hopkinson's declaration "that in view of the disclosed method of preparing the tissue graft, it is clear that the spongy/intermediate layer is considered to be 'extraneous' and not part of amnion or chorion layers." (*Id.* at 6.) Influential to Dr. Hopkins, and by extension, the USPTO, was the fact that

> [i]f the spongy layer is not removed, then the amnion and chorion layers are not directly laminated to each other and when the graft is rehydrated the layers would delaminate and potentially glide against each other, which would conflict with the purpose of the dehydrated tissue grafts claimed in the '494 patent.

(*Id.*)[5]

Surgenex responds that MiMedx's current position is barred by the doctrine of prosecution disclaimer. (Doc. 78 at 19–21.) "The doctrine of prosecution disclaimer precludes patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (citation modified). In other words, a patentee may not maintain an interpretation it previously disavowed. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.").

---

[5] The Court further discusses and construes the "directly laminated" claim language in Part III.B. of this Order.

However, prosecution disclaimer does not apply where the alleged disavowal is ambiguous. *Id.*

Here, Surgenex contends MiMedx argued against its current position in an *inter partes* review ("IPR") of the '494 Patent before the USPTO. (Doc. 78 at 19.) Before turning to MiMedx's statement, the Court notes the context in which it was made. MiMedx was responding to the argument that "substantially cleaned" meant "free of a significant or substantial portion of the blood, blood clots and other debris or contaminates that may be present on the amnion or chorion layers at the time of processing." (Doc. 78-7 Ex. 29 at 75.) MiMedx, disagreeing, said:

> Indeed, there is no requirement in the claims or suggestion in the specification that a significant or substantial portion of *all* the blood clots and spongy/connective tissue must be removed so that little or close to zero blood clots and the spongy/connective tissue remain in the tissue graft. Instead, the only requirement is that such elements are reduced. Thus, while Petitioner's expert, without any justification or support from the intrinsic record (or elsewhere), states that a person skilled in the art would have interpreted "substantially cleaned" to require removal of substantially *all* the blood clots and the spongy/connective tissue so that little or no blood clots and the spongy/connective tissue remain, this is simply incorrect.

(*Id.* (emphasis in original).)

Surgenex—after heavily editing the above paragraph—argues this is a "clear and unmistakable" statement disavowing MiMedx's current position that "wash" and "clean" necessitate removal of the spongy tissue. (Doc. 78 at 20.) No amount of emphasis, ellipses, alterations, and brackets to the above quote makes Surgenex's argument true. (*Id.* at 19.) MiMedx's unabridged statement clearly comments on the quantity of spongy tissue removed—not the necessity of the removal. (Doc. 78-7 Ex. 29 at 75 ("Instead, the only requirement is that such elements are reduced.")).

The same is true as to Dr. Baergon's declaration. Surgenex quotes Dr. Baergon as allegedly disagreeing with MiMedx's current position that washing and cleaning the amnion and chorion includes removing spongy tissue. But Surgenex, again, heavily editorializes the quote, presenting only half of Dr. Baergon's sentence and omitting the subsequent sentence that directly contradicts Surgenex's argument. (Doc. 78 at 20.)

Reading Dr. Baergon's statement in full, it is clear her opinion pertained only to the quantity of removal. "[A]ny washing and/or cleaning is necessarily not perfect and results in *some* amount of blood clots and/or extraneous tissue to remain so long as a sufficient amount is removed so as not to interfere with the safety and efficacy of the tissue grafts for the intended purpose." (Doc. 78-7 Ex. 30 at 165–66 (emphasis in original)).[6]

Accordingly, the Court rejects Surgenex's prosecutorial estoppel argument. Further, the Court finds that the '494 Patent *ex parte* reexamination supports MiMedx's position that one of ordinary skill in the art would consider the spongy tissue to be extraneous to the amnion and chorion layers given the specification and the prosecution history.

### iii.   The '259 Patent File History

MiMedx then directs the Court to a USPTO examiner's Notice of Allowability regarding the '259 Patent. (Doc. 82-2 Ex. 1); *see Laitram, LLC v. Ashworth Bros.*, No. 2022-1044, 2023 WL 3449148, at *3 (Fed. Cir. May 15, 2023) (citing to a patent's Notice of Allowability as part of its prosecution history). In explaining her reasons for allowance, the USPTO examiner made multiple findings regarding washing and spongy tissue.

First, she agreed that spongy tissue was extraneous to the amnion layer because the specification narrowly defined the amniotic membrane. (Doc. 82-2 Ex. 1 at 9.) Thus, she concluded that washing the amnion meant removal of extraneous material such as "blood clots and the spongy/intermediate layer." (*Id.*) Second, building on this conclusion, she found that "the spongy/intermediate layer is considered extraneous to both the amnion and the chorion, and thus 'separated and washed' amnion and chorion will have substantially all residual spongy/intermediate layer removed therefrom." (*Id.* at 10.) And finally, she noted that the claims require two washed layers to be "directly laminated to each other." (*Id.*) She explained "that natural placenta has a substantial amount of spongy/intermediate

---

[6]  The Court reminds Surgenex it has a duty of candor to this tribunal. Surgenex treads close to violating this duty when it presents to the Court materially altered quotes out of context. Such tactics do not advance Surgenex's case; they invite distrust and greater scrutiny. The Court will contemplate sanctions should Surgenex attempt the same moving forward.

layer between amnion and chorion, and thus the amnion and chorion are not 'directly laminated' to one another." (*Id.* at 11.)  Therefore, directly laminating the two layers "is possible only when there is substantially no intermediate material present between the layers." (*Id.* at 10.)  Accordingly, the examiner concluded that "[t]he claims do not permit for a substantial amount of spongy/intermediate layer to be present in between the first layer and the second layer." (*Id.*)

Surgenex does not respond to this file history.  Accordingly, the Court finds that this intrinsic evidence strongly supports MiMedx's contention that a POSITA would understand the spongy tissue to be extraneous to both the amnion and chorion and would therefore be washed and cleaned from these layers.

### iv.  The '437 Patent File History

Next, Surgenex directs the Court to an IPR challenge of the parent '437 Patent. Surgenex recognizes that the '437 Patent is not asserted here, but notes it has "substantially the same specification" as those in the '494 Patent family "and also contains the 'washing and substantially cleaning' term." (Doc. 78 at 20 n.6.)  It is not immediately clear that this proceeding is part of the prosecution history of the Asserted Patents, but even so, the Court is not persuaded by the USPTO's findings.

In the IPR challenge to the '437 Patent, the USPTO considered the same issue here: "The issue becomes, therefore, what is meant by extraneous tissue." (Doc. 78-7 Ex. 31 at 202.)  The USPTO rejected MiMedx's current interpretation; it found that extraneous tissue meant "residual debris or contamination"—not the spongy layer.  (*Id.* at 202–204.) The Court takes issue with this point; the USPTO impermissibly conflates two directives in the specification.  The '437 Patent specification first states: "Care is then taken to remove blood clots and other extraneous tissue from each layer of tissue until the amniotic membrane tissue and the chorion are clean." (*Id.* at 203)  In the following paragraph, the specification notes an additional removal: "Using a blunt instrument, a cell scraper or sterile gauze, any residual debris or contamination is *also* removed." (*Id.* (emphasis added).)  Because the specification "makes no mention of the spongy layer," the USPTO

interpreted "extraneous tissue" to mean "debris and contamination." (*Id.* at 204.) However, such an interpretation reads out the first directive to remove extraneous tissue and reads in redundancy. The Court is not persuaded by this reasoning. The specification clearly treats removal of "extraneous tissue" and "debris and contamination" as two different steps, so the Court will not interpret the two as renditions of the other.

Next, the USPTO found persuasive, strangely, Dr. Baergen's opinion that "one of ordinary skill in the art would have understood that a complete removal of the native 'spongy/connective' layer is virtually impossible." (*Id.* at 204.) Therefore, the USPTO concluded that "washing" and "cleaning" did not require removal of the spongy layer. (*Id.*) However, as discussed above, Dr. Baergen's opinion responded to the claim that little or no spongy tissue remained in the tissue graft after removal, which presupposes the idea that spongy tissue is removed. So, the Court is not convinced that Dr. Baergen's testimony supports the USPTO's conclusion that no spongy tissue is removed.

Finally, Surgenex notes that MiMedx appealed the USPTO's decision and the Federal Circuit issued a Federal Rule of Civil Procedure 36 affirmance, meaning the decision was affirmed without analysis. (Doc. 78 at 20); *MiMedx Grp., Inc. v. Musculoskeletal Transplant Found.*, 697 F. App'x 699, 700 (Fed. Cir. 2017). Importantly, this summary affirmance is not binding here. *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983) (recognizing that the "precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions" (citation modified)). The patent at issue there is not presently before this Court. Additionally, the '437 Patent IPR preceded, and thereby did not consult, the '494 Patent reexamination and '259 Patent prosecution histories discussed above. Lastly, the USPTO, in an IPR proceeding, interprets claim language under "the broadest reasonable construction standard," which "increases the possibility that the examiner will find the claim too broad (and deny it)." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 280 (2016). This is a "different burden of proof" than the "ordinary meaning standard" used by district courts. *Id.* at 282–83. Thus, the Supreme Court recognizes that, under these "different evidentiary

burdens," "[a] district court may find a patent claim to be valid, and the agency may later cancel that claim in its own review." *Id.* Accordingly, the Court finds that it is not bound by the Federal Circuit's summary affirmance because the Court now considers a different patent, under a different construction standard, and is aided by additional prosecution histories unavailable at the time.

### v. The Priority Applications

Surgenex next directs the Court to the "priority applications": the '728 application and the '467 provisional application. It argues that these applications "provide even more evidence that MiMedx's proposed construction is wrong" because "[t]he priority applications, like the issued patent, say nothing about removal of the spongy layer." (Doc. 78 at 21.) However, both priority applications reference removal of extraneous tissue. (Doc. 78-7 Ex. 27 at 34 ('467 application) ("Care is then taken to remove blood clots and other extraneous tissue . . . .")); (Doc. 78-4 Ex. 10 at 87 ('728 application) ("Carefully remove all chorion, clots, or other extraneous tissue from the membrane until it is clean and ready for next steps.").) Therefore, assuming that these applications are part of the prosecution histories of the Asserted Patents and thus relevant to claim construction, the Court finds that they are unhelpful to its current endeavor. These applications simply mirror the conundrum presented in the Asserted Patents: would a POSITA understand extraneous tissue to include spongy tissue?

### vi. Summary of Prosecution History

In sum, based on the foregoing prosecution histories, the Court finds that extraneous tissue includes spongy tissue. Across the prosecution histories, the patent applicant consistently held that the spongy tissue was apart from the amnion and the chorion membranes. And on three different occasions, the USPTO substantiated MiMedx's claim construction. The USPTO agreed that limiting the definitional scope of the amnion to the exclusion of the spongy layer alerts a POSITA that spongy tissue is extraneous to the amniotic membrane. The USPTO understood that the amnion and chorion naturally split along the spongy layer, and the remaining spongy tissue would remain on both membranes.

Therefore, the USPTO recognized that a POSITA would understand that this spongy tissue would need to be washed from the membranes in order for the two layers to be directly laminated to one another. Surgenex fails to cite any competing prosecution history related to these Asserted Patents that adequately refutes these findings. Accordingly, the Court finds that the prosecution history supports MiMedx's construction.

### d. Extrinsic Evidence

The parties ask the Court to look to three district court opinions to support their respective constructions. This constitutes extrinsic evidence as it is outside the public record. *See Vitrionics*, 90 F.3d at 1583 ("The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely."). The Court may only turn to extrinsic evidence if the public record does not "resolve any ambiguity in a disputed claim term." *Id.* The Court finds, for the reasons discussed above, that the specification and prosecution history sufficiently resolves the ambiguity in the terms "wash" and "clean." *See id.* ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.") Nevertheless, the Court finds that the cited cases are not helpful to its determination here.

MiMedx cites two cases holding "wash" and "clean" to mean the removal of spongy tissue: *MiMedx Grp., Inc. v. Nutech Med., Inc.*, No. 2:15-CV-0369-VEH (N.D. Ala. Jan. 26, 2017);[7] and *MiMedx Grp., Inc. v. Liventa Bioscience, Inc.*, No. 1:14-CV-1178-MHC, 2016 WL 4059361 (N.D. Ga. Mar. 9, 2016) (adopting report and recommendation). Surgenex cites to one case to support its construction that "wash" and "clean" do not include the removal of spongy tissue: *MiMedx Grp., Inc. v. Tissue Transplant Tech., Ltd.*, 354 F. Supp. 3d 742 (W.D. Tex. 2018) (rejecting motion to reconsider its adoption of the report and recommendation). Neither the Georgia case nor the Texas case cite evidence

---

[7] In *Nutech*, the Court accepted the parties' agreement that "wash" means "cleaned such that substantially all blood clots and intermediate 'spongy' tissue between the amnion and chorion are removed." (Doc. 82-10 Ex. 9 at 6.) The Court did not conduct a claim construction analysis. Therefore, this case provides little probative value to MiMedx's construction.

substantively different than that considered herein. *See Liventa*, 2015 WL 10734762, at *9 (N.D. Ga. Dec. 30, 2015) (report and recommendation) (construing "wash" to include removal of the spongy tissue because the prosecution history showed that the patent owner understood cleaning of the amnion to include removal of the spongy/connective tissue); *Tissue Transplant*, 354 F. Supp. 3d at 749 (construing "wash" to not include the removal of spongy tissue because "there is no mention of 'spongy' or 'connective' tissue in the specification").[8]   Therefore, the Court does not consider these cases because they are not "needed to assist" it "in determining the meaning or scope of technical terms in the claims." *See Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995); *see also Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1376 n.12 (Fed. Cir. 2019) (recognizing that a district court has discretion whether to consider other court decisions addressing related patents in its claim construction analysis).

### 2. Indefiniteness

Because the Court adopts MiMedx's proposed construction, it turns to Surgenex's indefiniteness argument.  As the challenging party, Surgenex has the burden to prove indefiniteness by clear and convincing evidence. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.  Surgenex argues that if the Court were to construe the wash terms to mean removal of "substantially all" the spongy tissue, they would be indefinite because "the specifications provide no information as to how to determine whether 'substantially all' of the spongy tissue has or has not been removed." (Doc. 78 at 22.)  The Court disagrees.

The word "substantial" is a term of degree. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005).  A term of degree must be accompanied

---

[8]  The Texas court's earlier order adopting the report and recommendation similarly rests its construction on the fact that the term "[s]pongy tissue is never used." (Doc. 78-8 Ex. 39 at 19–21.)

by objective boundaries, *see Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018), so as not to be a "purely subjective phrase." *See Niazi*, 30 F.4th at 1347 (citation modified); *see also Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("Indeed, claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." (citation modified)).  A Court looks to the intrinsic evidence (or extrinsic evidence, where relevant and available) for these parameters. *Niazi*, 30 F.4th at 1348.

Surgenex attempts to prove indefiniteness by noting the lack of a numerical boundary: "does 'substantially all' mean 99% of the blood clots and spongy layer tissue are removed? 95%? 90%?"  (Doc. 78 at 23.)  However, "a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Niazi*, 30 F.4th at 1347 (citation modified).  Therefore, MiMedx is not required to state such percentages to provide reasonable certainty of the scope of the invention to a POSITA.

Next, Surgenex attempts to prove indefiniteness by stating there is no baseline "to determine whether 'substantially all' of the spongy layer has been removed after washing/cleaning."  (Doc. 78 at 23.)  The Court disagrees.  The washed grouping specifications explain:

> The cleaning of the amnion is complete once the amnion tissue is smooth and opaque-white in appearance. If the amnion tissue is cleaned too much, the opaque layer can be removed. Any areas of the amnion cleaned too aggressively and appear clear will be unacceptable and will ultimately be discarded.

(Doc. 1-1 '494 Patent at 13.)[9]  This description provides both a textural and visual baseline; removal of the spongy tissue is complete when the amnion is smooth and opaque-white. The specification also speaks to the amount of removal, cautioning efforts to clean the amnion too much.  Too much cleaning is evidenced by the removal of the opaque layer, resulting in areas with a clear appearance which render the membrane unacceptable.

---

[9]  As stated, the '253 and '259 Patents share a specification with the '494 Patent.  The '137 Patent also shares a materially similar description of this cleaning.  (Doc. 1-1 at 137.)

Therefore, the specification provides objective standards for the removal of extraneous material, which includes the spongy tissue.

Finally, Surgenex argues that the specifications provide no instructions on how to remove the spongy tissue. (Doc. 78 at 22.) This is incorrect. Dr. Baergen opined that "[w]hile the spongy layer may remain on the amnion and chorion after separation, it may be subsequently removed by washing and/or cleaning the amnion and chorion by methods disclosed in the '494 Patent (for example, by using a blunt instrument, finger, gauze, or a cell scraper)." (Doc. 107-10 Ex. 39 at 5.) The USPTO cited this exact testimony in the '494 Patent reexamination when overruling prior art rejections.[10] (Doc. 82-8 Ex. 7 at 5.) This prosecution history confirms that, in light of the specification, a skilled artisan would be reasonably certain as to how to substantially remove spongy tissue from the amnion and chorion.

Accordingly, in light of the specification and prosecution history, the Court finds that Surgenex has not carried its burden to show that "substantially all" is indefinite by clear and convincing evidence.

**B. Claim Terms: "directly laminated" grouping**

The parties stipulated to the Court grouping the following terms: "directly laminated" ('494 Patent: Claims 1, 9, 10; '259 Patent: Claim 1); "laminated directly to each other" ('137 Patent: Claim 1); and "direct contact" ('253 Patent: Claim 1). (Doc. 119 at 3 n.1.)

| MiMedx's Proposed Construction | Surgenex's Proposed Construction | The Court's Construction |
|---|---|---|
| "wherein substantially all of the extraneous material (e.g., blood clots and spongy/connective tissue) is removed so that the amnion and/or chorion | Plain and ordinary meaning. These claim terms do not require removal of the intermediate or spongy layer. | Unite two or more layers with immediate physical contact. Removal of the intermediate or spongy layer is not required. |

---

[10] The fact that the USPTO reexamination specialists—interpreting wash to include substantial removal of the spongy tissue—had no apparent issue comparing the scope of MiMedx's invention with prior art when withdrawing the previous art rejections, supports the idea that those skilled in the art did understand the scope of the invention with reasonable certainty. *See Sonix*, 844 F.3d at 1379–80.

| layers are directly [united/contact each other]" | MiMedx's proposed construction would render the terms are indefinite. | |
|---|---|---|

The '494 Patent, '259 Patent, '253 Patent, and the '137 Patent instruct a POSITA to directly laminate two washed layers (one amnion and the other an amnion or chorion) to each other. MiMedx asks this Court to also interpret "directly laminated" as requiring removal of substantially all extraneous material, including the spongy tissue. (Docs. 82 at 19; 107 at 14.) Surgenex responds that the plain and ordinary meaning of "directly laminated" does not require removal of the intermediate or spongy layer. (Doc. 78 at 24.) The Court agrees with Surgenex.

Here, unlike "wash" and "clean," the ordinary meaning of "directly laminated" does not connote removal. The term "directly laminated" pertains to the placement of the amnion and chorion membranes. The parties agree that "laminated" means "uniting or adhering two or more layers, for example by layering two or more wet layers of amnion and/or chorion and then dehydrating the layers together to unite them." (Doc. 119 at 2.) The dictionary definition of "directly" means "immediate physical contact." *See Directly*, Merriam-Webster, https://www.merriam-webster.com/dictionary/wash (last visited March 4, 2026). Therefore, the ordinary meaning of "directly laminated" would be to unite two or more layers with immediate physical contact.

MiMedx argues that a POSITA would understand the immediacy of such contact to necessitate substantial removal of the spongy tissue. (Doc. 107 at 14.) MiMedx's position is stretched too thin. Unmoored from the "wash" and "clean" terms, "directly laminated" would not alert a POSITA to substantially remove the spongy tissue. An example makes this clear. Removing "washed and substantially cleaned" from the '494 Patent Claim 6, the Claim does not suggest removal.

> A dehydrated, laminated tissue graft, wherein the tissue graft consists essentially of one or more amnion layers and one or more amnion layers and one or more chorion layers wherein each of the amnion and chorion layers:
>
> are separated from a placenta to provide separate layers of amnion and chorion,

- 22 -

. . . and,

are layered directly over each other and are laminated and heat dehydrated together to provide the dehydrated, laminated tissue graft.

(Doc. 1-1 '494 Patent at 15.)   Reading this language, there is simply no instruction to remove anything from the amnion or chorion layers.   Therefore, "wash" and "clean" perform the lift MiMedx attempts to attribute to "directly laminated."   But MiMedx knows this.   It acknowledges that "the amnion and chorion of the grafts are 'directly' laminated, in that there is no intervening layer between the claimed amnion and chorion since substantially all extraneous tissue, e.g. blood clots, spongy material, and other debris, *had been washed and cleaned from the graft*."   (Doc. 82 at 19 (emphasis added).)

There is also nothing in the specifications that describe "directly laminated" to mean removal of extraneous material.   That is ostensibly why MiMedx only cites the prosecution history to support its construction.   However, these are the same histories discussed above in construing the "wash" grouping.   Although the USPTO referred to "directly laminated," this was done to contextualize what is being removed from the amnion and chorion at the washing stage.   In other words, the claim terms "wash" and "clean" were the impetus for removal; the "directly laminated" terms aided in flagging the spongy tissue as the object of removal—*i.e.*, the extraneous material between the two layers.

MiMedx's proposed construction appears to be a fail-safe should the Court construe the "wash" grouping to not include substantial removal of the spongy tissue.   But the Court did not.   Thus, MiMedx's construction is largely moot.   Each of the '494, '259, '253, and '137 Patents preface "directly laminated" with a washing of the amnion and chorion layers. Given the Court's earlier construction, extraneous material (including the spongy tissue) is removed before the layers are directly laminated to one another.

For these reasons, the Court rejects MiMedx's proposed construction and adopts the ordinary meaning of the terms "directly laminated": to unite two or more layers with immediate physical contact.   *See Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the

- 23 -

invention will be, in the end, the correct construction." (citation modified)).  Because the Court does not adopt MiMedx's construction, it need not address Surgenex's indefiniteness argument.

### C.  Claim Term: "not decellularized" ('839 Patent: Claims 1, 2)

| MiMedx's Proposed Construction | Surgenex's Proposed Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | "retains its native cellularity" | Unnecessary.  Parties do not dispute the scope and construction of this claim. |

The '839 Patent explains that pertinent chorion layers to be used in the laminated placental tissue graft are "not decellularized."  (Doc. 1-1 at 64.)  MiMedx argues the Court should construe "not decellularized" in accordance with its "plain and ordinary meaning."  (Doc. 82 at 25.)  Surgenex argues the Court should construe the term to mean "retains its native cellularity."  (Doc. 78 at 33.)

It is not readily apparent to the Court what the parties are disputing here.  The parties appear concerned with the amount of retained cellularity a chorion layer must possess after processing to be considered "not decellularized."  MiMedx states "not decellularized" "should not require the retention of every cell," and claims Surgenex's construction suggests that all native cellularity is retained.  (Doc. 82 at 26–27.)  However, Surgenex responds that its construction "does not require the retention of every cell," but rather preempts an argument "that a small number of remaining native cells can still be considered 'not decellularized.'"  (Doc. 102 at 27.)  MiMedx seems to be on the same page.  It argues that a POSITA would understand "not decellularized" to mean "relatively minor cell removal," adding that the POSITA would understand the inverse—decellularized—to mean "removing substantially all of the cells and cellular components in the tissue."  (Doc. 82 at 26.)  Therefore, both parties agree that not every cell must be retained for a chorion layer to be considered "not decellularized," but acknowledge that removing substantially all of the cells, *i.e.*, leaving a small number of native cells, would render the membrane decellularized.

"When the parties present a fundamental dispute regarding the scope of a claim

- 24 -

term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  Here, there is no fundamental dispute as to the scope of "not decellularized."  Therefore, it is unnecessary for the court to construe this term.  *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1380 (Fed. Cir. 2024) (acknowledging that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy" (citation modified)).

**D.  Claim Term: "a shelf-life of at least 5 years" ('259 Patent: Claim 1).**

| MiMedx's Proposed Construction | Surgenex's Proposed Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | Indefinite. | Plain and ordinary meaning.  Not indefinite. |

The '259 Patent claims that a dehydrated placental tissue graft "has a shelf-life of at least 5 years" when stored in a "sealed, deoxygenated container" at room temperature. (Doc. 1-1 at 48.)  Surgenex argues that "shelf-life of 5 years" is indefinite because there are multiple ways to measure shelf-life, and the patent does not provide guidance as to which methodology to use.  (Doc. 102 at 27.)  Surgenex must establish indefiniteness by clear and convincing evidence.  *BASF Corp.*, 875 F.3d at 1365.  The Court finds it fails to do so.

To establish that the scope of "shelf-life of 5 years" is not reasonably certain, Surgenex must prove, by clear and convincing evidence, that: (1) the "claimed characteristic can be measured in multiple ways"; (2) "those different measurements would typically yield a different result when applied to the same sample"; and (3) "the intrinsic record fails to provide reasonable certainty about which measurement was intended by the claims." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 936 (Fed. Cir. 2024) (citation modified).  Surgenex readily establishes prongs one and three.

As to the first prong, both MiMedx's and Surgenex's experts testify of different methods of measuring shelf-life.  Surgenex's expert, Dr. Rouzbeh R. Taghizadeh, opined that the shelf-life of a tissue graft could be assessed by: (1) microbiology quality testing; (2) testing the water content, water vapor transmission rate, and water absorption of the

tissue grafts; (3) testing the mechanical properties of the tissue grafts such as tensile strength and elongation of the amnion; (4) functional testing of the graft to see if it works for its intended clinical purposes; and (5) testing of the tissue graft's packaging. (Doc. 78-2 at 42–43 ¶¶ 107–08.) MiMedx's expert, Dr. Badylak, opined that the shelf-life of a tissue graft could be assessed by two standardized methods: (1) real-time aging; and (2) accelerated aging. (Doc. 82-6 Ex. 5 at 25–26 ¶¶ 90–91.) Additionally, Dr. Badylak opined that "a POSITA would have known of various methods to establish a shelf life for a tissue graft." (*Id.* ¶ 90.) Accordingly, there is clear and convincing evidence that a tissue graft's shelf-life can be measured in multiple ways.

As to the third prong, the '259 Patent's intrinsic record is silent on measuring shelf-life. Surgenex explains that the claim language, specification, and prosecution history do not set forth any procedures to determine shelf-life. (Doc. 78 at 35.) Notably, MiMedx does not refute this contention; it does not identify *any* intrinsic evidence in its briefing as to the "shelf-life" claim. (*See* Doc. 102 at 27 ("Tellingly, MiMedx does not cite the '259 patent even *once* in its brief to support its definiteness argument.").) Accordingly, there is clear and convincing evidence that the intrinsic record fails to provide reasonable certainty about which measurement of shelf-life was intended by the claims.

However, Surgenex fails to establish the second prong. The existence of "multiple different methodologies . . . for measuring a parameter recited in a claim does not by itself render a claim indefinite." *Ball Metal Beverage Container Corp. v. Crown Packaging Tech., Inc.*, 838 F. App'x 538, 542 (Fed. Cir. 2020); *see also Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1367 (Fed. Cir. 2014) ("That there is more than one way of determining the average particle diameter of a particular sample does not render that clear claim language indefinite."). Instead, "the relevant inquiry then becomes whether the differing methodologies lead to materially different results in defining the boundaries of the claim." *Ball Metal Beverage*, 838 F. App'x at 542.

Although Surgenex states "each method would provide a different result," (Doc. 78 at 35), it fails to prove this fact by clear and convincing evidence. *See Grace Instrument*

*Indus., LLC v. Chandler Instruments Co.*, LLC, 57 F.4th 1001, 1008 (Fed. Cir. 2023) ("[A]ny fact critical to a holding on indefiniteness must be proven by the challenger by clear and convincing evidence." (citation modified)).  The parties' experts agree that "shelf-life" is a well-known term used to describe the length of time for which a product remains usable.  (Doc. 82-6 at 25–26 ¶ 90; Doc. 78-2 at 41 ¶ 104.)  However, Dr. Taghizadeh opines that each method for measuring shelf-life *could* be assessed using different acceptance criteria, so variable results in testing are inevitable.  (Doc. 78-2 at 41–42 ¶ 105.)  For example, he explains that, under the moisture content method, a 7.5% moisture content reading "would satisfy an acceptance criteria permitting less than 20% water moisture but not an acceptance criteria permitting less than 5% water moisture." (*Id.* at 43–44 ¶ 110.)  But just because a method *could* be measured against varying criteria, does not mean a POSITA would do so.  Dr. Taghizadeh does not explain why a POSITA, who understands the concept of "shelf-life" as it relates to tissue grafts, would have no idea the acceptable range of moisture content reading for determining whether a tissue graft had a shelf-life of five or more years.[11]  He simply testifies that a POSITA could apply a 5% or 20% criteria under this method.  But Dr. Taghizadeh does not opine that such discrepancies in acceptance criteria are typical of the moisture content method when applied here.  If it were true, two POSITAs using these differing criteria would render different results when testing the shelf-life of a placental tissue graft (*i.e.*, a graft with a 7.5% moisture content reading would pass one standard but not the other).  But Dr. Taghizadeh's testimony of varying results is speculative and cannot establish indefiniteness without evidence that a POSITA would use either of these two criteria in this context.  *See Ball Metal Beverage*, 838 F. App'x at 542 ("We have explained that 'the mere possibility of different results from different measurement techniques' does not render a claim indefinite." (quoting *Takeda*, 743 F.3d at 1366–67)).

  *Janssen* supports this conclusion.  In *Janssen*, neither the specification nor the

---

[11] A person of ordinary skill is one who "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Phillips*, 415 F.3d at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

claims specified a certain measurement technique to use. 97 F.4th at 937. The district court held although the challenger pointed to evidence that different "measurement techniques *can* yield different results," it found that the discrepancy was an outlier because it "was not based on a discrepancy typical of the measurement technique used." *Id.* (emphasis in original). Therefore, the Federal Circuit affirmed the district court's determination that the claims were not indefinite because the challenger "did not present evidence that different measurement techniques *would* typically yield different" measurements. *Id.* (emphasis added). Similarly, Dr. Taghizadeh fails to establish the typical discrepancies in acceptable criteria when measuring shelf-life under the moisture content method. Therefore, although such discrepancies in criteria *could* occur, Surgenex fails to demonstrate that such discrepancies are typical, *i.e.*, not outliers, and therefore *would* yield varying results if employed.

Accordingly, the Court finds that Surgenex fails to establish that "a shelf-life of 5 years" is indefinite by clear and convincing evidence.

**E. Claim Term: "wherein said assembled and laminated layers are dehydrated together in a drying fixture" ('494 Patent: Claim 2)**

| MiMedx's Proposed Construction | Surgenex's Proposed Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | Not a patentable limitation; product-by-process. | Not a patentable limitation. |

The parties agree that "wherein said assembled and laminated layers are dehydrated together in a drying fixture" should be construed according to its plain and ordinary meaning. (Doc. 82 at 31; Doc. 78 at 38.) Surgenex, however, contends that this claim language is not entitled to patentable weight because it amounts to a product-by-process claim. (Doc. 78 at 37.) "A product by process claim is one in which a product is claimed, at least in part, by the 'process by which it is made.'" *Kamstrup A/S v. Axioma Metering UAB*, 43 F.4th 1374, 1381 (Fed. Cir. 2022) (quoting *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985)). A product-by-process claim "cannot be used to distinguish the prior art" when determining the validity of the patent, *C.R. Bard, Inc. v. AngioDynamics, Inc.*, No.

2023-2056, 2025 WL 3627397, at *2 (Fed. Cir. Dec. 15, 2025), "because of the longstanding rule that an old product is not patentable even if it is made by a new process." *Kamstrup*, 43 F.4th at 1381 (citation modified).

But there is an exception. If the process limitation "connotes specific structure and may be considered a structural limitation" to the product, then it can be considered when determining the patent's validity, *i.e.*, whether prior art anticipates the structure of the product. *See In re Nordt Dev. Co.*, LLC, 881 F.3d 1371, 1374 (Fed. Cir. 2018); *see also In re Song*, No. 2025-1653, 2026 WL 453579, at *3 (Fed. Cir. Feb. 18, 2026) ("The patentability of a product-by-process claim is determined by the structure of the resulting product, not by the performance of the process steps."). In other words, the product must exhibit structural differences resulting from the process limitation. *See In re Nordt*, 881 F.3d at 1375 (recognizing "there are clear structural differences between a knee brace made with fabric components and a knee brace made with injection-molded components" (citation modified)). MiMedx fails to invoke this exception here.

MiMedx argues that although the claim language at issue "may also describe a manufacturing process" it "brings structural characteristics" to the tissue graft product. (Doc. 107 at 22.) MiMedx fails to prove this point. It claims the '494 Patent "describes dehydrating layers together in drying fixtures, and notes various common-sense ways that dehydrating via a drying fixture may impact the structure of a tissue graft." (Doc. 107 at 23.) But the '494 Patent does not describe the dehydration process as altering the structure of the tissue graft. The specification states that dehydrating a tissue graft in a drying fixture will cause the tissue to "mold itself around the raised texture or into the indented texture—essentially providing a label within the tissue itself." (Doc. 1-1 at 13.) Preferably, this label will identify "the stromal side from the basement side of the dried tissue," because it is desirable for the surgeon to place the basement side of the graft onto the patient's native tissue. (*Id.*) But marking a product with information does not alter the structure of the product; the tissue graft's clinical properties remain regardless of the embossed label. *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1065 (Fed. Cir. 2010)

- 29 -

(holding that a product's instructions are not entitled to patentable weight because "[r]emoving the instructions from the claimed kit does not change the ability of the drug to treat respiratory diseases").[12]

Next, the specification explains that the number of tissue layers placed in the drying fixture can impact the thickness and strength of the graft. (Doc. 1-1 at 13 ("[M]ultiple layers of tissue are placed on the same drying fixture to create a laminate-type allograft material that is thicker and stronger than a single layer of allograft material.").) But this language attributes any structural differences between grafts to the number of tissue layers *not* the dehydration process itself. Therefore, it does not appear that a dehydrated placental tissue graft has a different structure than a hydrated placental tissue graft.[13]

MiMedx does not point to any other intrinsic evidence in support of its contention that dehydration is a structural limitation. Accordingly, the Court finds that the claim language "wherein said assembled and laminated layers are dehydrated together in a drying fixture" is a product-by-process claim limitation that is not entitled to patentable weight.

### F. Claim Term: "for use in eliminating . . ."

The parties dispute the construction of the following claim:

> The tissue graft of claim 1 for use in eliminating frenum pull, patella regeneration, treating mouth sores and oral lesions, guide tissue bone regeneration, periodontal regeneration, oral reconstruction, vestibuloplasty, tissue regeneration around dental implants, esophagus reconstruction, plastic surgery, cosmetic surgery, peripheral arterial disease, bladder reconstruction, orbital floor repair, treatment of foot ulcers, corneal repair, adhesion barrier

---

[12] To the extent MiMedx is arguing the process limitation is attempting to capture informational content (*i.e.*, dehydration is necessary to emboss the grafts with directional use), then the printed matter doctrine is implicated and MiMedx must establish that the information is functionally related to the product in order for the process to be patentable. *See Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1032 (Fed. Cir. 2018). But MiMedx could not likely make that showing here. *See C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1382 (Fed. Cir. 2020) ("[T]he mere marking of products, such as meat and wooden boards, with information concerning the product, does not create a functional relationship between the printed information and the substrate.").

[13] The '494 Patent states that a dehydrated graft is rehydrated before using it for clinical applications. (Doc. 1-1 at 14 ("When ready for use, such allografts are re-hydrated . . . .").) Therefore, the product itself is truly a hydrated placental tissue. *In re Nordt*, 881 F.3d at 1374 ("[W]hen considering the patentability of product claims that contain process limitations, claim scope is generally based on the product itself, not the process.").

in spinal implant procedures, adhesion barrier in general surgery, use as vascular conduits, increasing the zone of gingival, or genitourinary reconstruction" ('697 Patent: Claim 8).  Below is the parties' proposed constructions.

| MiMedx's Proposed Construction | Surgenex's Proposed Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | Not a patentable limitation; intended use. | Not a patentable limitation. |

Surgenex argues that the above claim language is not entitled to patentable weight because it only describes the intended use of the invention.  (Doc. 78 at 38.)  MiMedx responds that the claim language should be afforded patentable weight because it is limited by both the listed "medical uses the claimed graft is configured to serve," (Doc. 107 at 23), and the preamble, which provides "structural limitation for the dependent claim."  (Doc. 82 at 33.)  The Court agrees with Surgenex.

The medical uses of the tissue graft do not limit the claim.  *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003) ("An intended use or purpose usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates."). Here, the claim merely lists the contexts in which the tissue graft may be used: treat mouth sores, tissue regeneration, plastic surgery, treat foot ulcers, etc.  Therefore, the medical uses do not limit the claim and are not afforded patentable weight.

However, the preamble can limit the claim "if the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or if the claim preamble is necessary to give life, meaning, and vitality to the claim." *In re Xencor, Inc.*, 130 F.4th 1350, 1357 (Fed. Cir. 2025) (citation modified).  But the preamble is not limiting "when it merely gives a statement of purpose or intended result." *Id.* at 1358; *see also In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019) ("Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim."). Here, the preamble language states: "The tissue graft of claim 1 for use in . . . ." (Doc. 1-1 at 161.)    This  language  merely  identifies  the  invention  and  a  statement  of  use.

Additionally, the phrase "for use in" does not go to the "essence" of the invention, so it does not give "life and meaning" to the medical uses described in the body of the claim. *But see Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) (finding that preamble language "diagnosing" goes to the essence of the invention, and thereby gives life and meaning to the diagnosis steps listed in the body of the claim); *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1340–41 (Fed. Cir. 2010) (finding that "decoding" is "the essence or a fundamental characteristic of the claimed invention," and gives the "intended objective" of the methods and structures described in the body of the claims). Therefore, "the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Accordingly, the Court does not afford this claim any patentable weight.

**IV.  CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the disputed claims in the Asserted Patents are construed as explained herein.

Dated this 18th day of March, 2026.

_____
Honorable Susan M. Brnovich
United States District Judge