**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MiMedx Group Incorporated,<br><br>Plaintiff,<br><br>v.<br><br>Surgenex LLC,<br><br>Defendant. | No. CV-24-03558-PHX-SMB<br><br>**ORDER** |

Before the Court are MiMedx's and Surgenex's Opening and Responsive Apex Deposition Briefs. (Docs 188, 189; Docs. 168, 169.)  The Court will permit the deposition of both Chief Executive Officers, with limitations, as follows.

## I.   BACKGROUND

This is a discovery dispute.  Each party seeks to depose the other's CEO.  Though both maintain the propriety of their own request, they argue the reciprocal demand is improper according to the apex deposition doctrine.  The Court permitted each party to brief the issue and file responsive memorandum. (Doc. 154.)

## II.   LEGAL STANDARD

It is very unusual for a court to prohibit the taking of a deposition absent extraordinary circumstances.  When a party seeks to take the deposition of an official at the highest level or "apex" of a corporation, however, the Court may exercise its authority under Federal Rule of Civil Procedure 26(c)(1) to limit discovery.  *See Byrne v. Ameris Bank*, No. 8:24-CV-01989-MWC-JDEX, 2025 WL 3724463, at *2 (C.D. Cal. Nov. 17,

2025).  Courts recognize that "such discovery creates a tremendous potential for abuse or harassment."  *Id.* (citation modified).  Nonetheless, the party seeking to prevent the deposition carries a heavy burden.  *Finisar Corp. v. Nistica, Inc.*, No. 13-CV-03345-BLF(JSC), 2015 WL 3988132, at *1 (N.D. Cal. June 30, 2015) (citation modified).

"In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods."  *Apple Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (citation modified).  The first factor is not stringent.  "The party seeking to take the deposition need not prove conclusively that the deponent certainly has unique non-repetitive information; rather, where a corporate officer may have any first-hand knowledge of relevant facts, the deposition should be allowed."  *OMA Constr., Inc. v. Teamsters Loc. 174*, No. 2:22-CV-01631-LK, 2024 WL 1156411, at *4 (W.D. Wash. Mar. 18, 2024) (citation modified).  The second factor is not determinative.  "Formal 'exhaustion' of other requirements is not an absolute requirement; instead, exhaustion of other discovery methods is an important, but not dispositive, consideration for a court to take into account in deciding how to exercise its discretion."  *Finisar Corporation*, 2015 WL 3988132, at *2.  Accordingly, an apex deposition is only prohibited where the burden on the deponent outweighs the need for access to information relevant to the case.

## III.    DISCUSSION

The parties do not dispute that both CEOs are sufficiently high-ranking to be considered apex deponents.  Thus, the question is whether each CEO is sufficiently removed from the pertinent case to have no first-hand, relevant information justifying his deposition.

### A.  MiMedx's CEO: Joseph Capper

As the party seeking to prevent the deposition of Joseph Capper, MiMedx bears the relevant burden.  MiMedx disputes Mr. Capper's allegedly relevant and first-hand

knowledge.

Surgenex argues that Mr. Capper has personal knowledge central to MiMedx's Damages theory. (Doc. 189 at 7.) It states that MiMedx's alleged damages flow directly from Q code[1] reimbursement rates which generally drive placental allograft sales, and Mr. Capper signed the third-party agreements related to those rates. (*Id.* at 3–4.) Surgenex adds that Mr. Capper approved, oversaw, and articulated MiMedx's reimbursement strategy to influence and lower the Centers for Medicare & Medicaid Services' ("CMS") bloated reimbursement rates. (*Id.*) Surgenex evidences this by pointing to, *inter alia*, earnings calls where Mr. Capper details MiMedx's take on the high CMS rates, and a press release where Mr. Capper discussed MiMedx's commitment to reforming overpriced reimbursement rates.

Additionally, Surgenex argues that Mr. Capper's deposition is necessary to respond to MiMedx's allegations that it is entitled to lost profits damages. (*Id.* at 4.) It explains that Mr. Capper's lobbying efforts to reduce CMS reimbursement rates subsequently reduced MiMedx's profits from its own products. Thus, a loss in profits might be attributable to MiMedx's lobbying efforts as opposed to Surgenex's alleged infringing activity. Further, Surgenex explains that when deposing MiMedx's Director of Technology Transfer, Billy Lloyd, he could not answer questions about the agreements MiMedx entered to purchase Q codes, so it noticed Mr. Capper's deposition that same evening. (Doc. 169 at 4.)

MiMedx responds that its Q code and reimbursement strategy is only tangentially related to this case. (Doc. 168 at 5.) It explains that the primary driver of its damages is Surgenex's pricing, average sales price practices, and "hundreds of millions of dollars in sales of accused products"—information which is necessary to determine a reasonable royalty. (Doc. 168 at 6.) MiMedx also contends that Mr. Capper's statements and comments do not demonstrate first-hand knowledge of the facts of this case because they

---

[1] According to Surgenex, "Q codes are assigned by the Centers for Medicare & Medicaid Services to identify drugs, biologicals, and medical equipment or services not identified by HCPSCS Level II codes, but for which codes are needed for Medicare claims processing, such as placental allografts." (Doc. 189 at 3 n.1.)

only evidence industry-wide reform efforts not exact pricing specific to MiMedx's and Surgenx's products. (*Id.* at 7.)

But MiMedx concedes that the new regulation scheme—which Mr. Capper lobbied for—impacts product pricing. (*Id.* at 8.) It argues, however, that although the scheme "drastically" decreased Sugenex's pricing, it did not have the same proportional impact on MiMedx's lower-priced products and thus would not materially impact its lost-profits analysis. (*Id.*) In short, MiMedx accepts that Mr. Capper "participated in lobbying" for the new regulations, (*Id.* at 13), and that such regulations impacted the pricing of both parties' products, (*Id.* at 8). Therefore, Mr. Capper has first-hand knowledge of relevant facts.

Accordingly, the Court denies MiMedx's request to quash Mr. Capper's deposition and grants Surgenex's request to compel Mr. Capper's deposition, subject to the following limitations. The Court agrees with MiMedx that four hours is unnecessary. Thus, the Court accepts MiMedx's alternative request and will permit Surgenex to depose Mr. Capper for no more than two hours.

### B. Surgenx's CEO: Abel Bullock

Surgenex does not dispute that MiMedx may depose Abel Bullock. It argues, however, that the Court should limit the deposition to four hours, rather than the full seven hours permitted by Rule 30 as requested by MiMedx. The Court agrees that seven hours is unnecessary. However, because Mr. Bullock's testimony goes to both infringement and damages, a discrepancy of time between the two CEOs is appropriate. Accordingly, MiMedx may depose Mr. Bullock for no more than four hours.

### IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that MiMedx is compelled to make CEO Joseph Capper available for a deposition of no more than two hours.

…

…

- 4 -

**IT IS FURTHER ORDERED** that Surgenex is compelled to make CEO Abel Bullock available for a deposition of no more than four hours.

Dated this 13th day of May, 2026.

Honorable Susan M. Brnovich
United States District Judge